UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SUSAN JOAN MATTHEWS and
KEVIN J. PASTERNAK,

Plaintiffs,

v.                                                    Case No. 6:25-cv-143-JA-RMN

SANFORD, SANFORD HEALTH,
and THE EVANGELICAL
LUTHERAN GOOD SAMARITAN
SOCIETY,

Defendants,

_____

## ORDER

This case is before the Court on the parties' *Daubert*[1] motions (Docs. 46 &
51) and their responses in opposition (Docs. 54 & 59). Based on the Court's
review of the parties' submissions, both motions must be granted in part and
denied in part.

## I.    BACKGROUND

Defendants—Sanford, Sanford Health, and the Evangelical Lutheran
Good Samaritan Society—allegedly own or operate the Good Samaritan
Kissimmee Village (Good Samaritan), a senior-living complex located near
Kissimmee, Florida. (Am. Compl., Doc. 30, ¶ 6). In 2017, Good Samaritan

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

sustained then-unprecedented flood damage from Hurricane Irma that was purportedly exacerbated by a critical failure of the property's waste-water treatment facility, resulting in contamination of the floodwater with biological toxins. (*Id.* ¶¶ 9, 21). Good Samaritan is accused of failing to implement any significant flood-mitigation measures in the immediate years after Irma. (*Id.* ¶¶ 11–13).

Plaintiffs, unaware of this history, signed a lease agreement at Good Samaritan in 2021, intending to live out the remainder of their lives at the facility. (*Id.* ¶¶ 7, 20). Their plans changed in 2022 when Hurricane Ian struck the property, inundating Plaintiffs' unit with toxic floodwater, and destroying most of their possessions. (*Id.* ¶ 19). Plaintiffs allege that Defendants' failure to make necessary repairs after Irma and to provide adequate warnings to new tenants about the recent history of flooding at Good Samaritan allowed for the destruction of their property. (*Id.* ¶ 20). Plaintiffs bring two counts against Defendants—for negligence (Count I) and negligent failure to warn (Count II).

The parties retained experts to advance their respective theories of the case. (*See* Docs. 46-1, 51-1, & 51-2). Plaintiffs offer the testimony of Richard A. Halquist, an emergency-management specialist who opines that Good Samaritan faced an "extreme" risk of flooding before Hurricane Ian struck the property. (Doc. 46-1 at 24). Defendants offer the opinions of (1) forensic meteorologist Megan D. Walker, and (2) stormwater engineer David W.

Hamstra. (Docs. 51-1 & 51-2). Ms. Walker analyzed a litany of official data sources relating to rainfall totals during Hurricanes Irma and Ian and opines that while Irma was a significant storm event, Ian was an exceptionally powerful and rare storm that produced unprecedented quantities of rainfall at Good Samaritan. (Doc. 51-1). Mr. Hamstra opines that adequate mitigation measures were not timely available to Good Samaritan. (Doc. 51-2 at 34). Both parties move to exclude the opposing expert opinions under *Daubert* and Federal Rules of Evidence 702 and 403. (Docs. 46 & 51).

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert opinions and "compels" the Court "to perform [a] critical 'gatekeeping' function." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Daubert*, 509 U.S. at 589 n.7). This gatekeeping obligation "applies to all expert testimony," not just "scientific" evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Rule 702, a qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

3

Fed. R. Evid. 702. "The party offering the expert has the burden of satisfying each of these . . . elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

## III.  DISCUSSION

The Court addresses the challenged opinions of Mr. Halquist, Ms. Walker, and Mr. Hamstra in turn.

### A.    Richard A. Halquist

Plaintiffs retained Mr. Halquist to assess "the collective details substantiating flood risk to the people and built environment within the campus confines" at Good Samaritan. (Doc. 46-1 at 14). Mr. Halquist, relying on his experience as an Osceola County Emergency Operations Manager and his training as a Certified Floodplain Manager, undertook a "comprehensive evaluation of hydrological, topographic, and regulatory factors." (*Id.* at 26). He opines that "an *extreme* degree of flood risk to the Good Samaritan campus" existed at the time Hurricane Ian struck the property. (*Id.* at 24) (emphasis in original).

Defendants argue that Mr. Halquist's assessment lacks a reliable methodology, that he is unqualified to offer his opinions, and that he offers impermissible legal conclusions. (Doc. 46 at 9, 14, 17). Plaintiffs concede that Mr. Halquist offers legal conclusions on pages 29–30 of his report but otherwise

oppose the motion.[2]

### 1. Summary of Mr. Halquist's Opinions

Mr. Halquist possesses substantial experience and specialized certification in flood risk management. His history with Good Samaritan dates back to his tenure as a Kissimmee Fire Lieutenant, during which he personally responded to flood-related emergencies at the property. (Doc. 46-1 at 1, 11). He joined the Osceola County Office of Emergency Management (County Office) in 2004, where his responsibilities included risk assessment, operational planning, and healthcare facility plan reviews. (Doc. 46-1 at 3). Although Mr. Halquist does not hold a college degree, he has completed coursework in emergency management and helped lead the County's response to multiple hurricanes. (Doc. 46-2 at 15:24). He has experience operating the Federal Emergency Management Agency's (FEMA) "HAZUS" geographic modeling software, is licensed as a Florida Professional Emergency Manager, and is a Certified Floodplain Manager. (Doc. 46-2 at 25:17–18).

During his tenure with the County Office, Mr. Halquist exercised direct oversight of the county-wide flood risk assessment for the 2015 and 2020 Local Mitigation Strategies. (Doc. 46-1 at 4, 339; Doc. 46-2 at 56:1–10). To develop

---

[2] Because Plaintiffs admit that pages 29–30 of Mr. Halquist's report contain impermissible legal conclusions as to the foreseeability of the flood, those opinions must be excluded.

these strategies, he utilized the HAZUS platform to conduct Hazard Identification and Risk Assessments (HIRAs). (Doc. 46-1 at 11). The HIRA delivers "granular data" on flood hazards and incorporates analyses of 10-, 25-, 50-, 100-, and 500-year flood return periods. (Doc. 46-2 at 56:1–4; Doc. 46-2 at 339). Mr. Halquist asserts that through his modeling, emergency-response work, and role as a Certified Floodplain Manager, he is familiar with the flood vulnerabilities at Good Samaritan.

In his expert report, Mr. Halquist details a long history of flooding at Good Samaritan. He claims that during Hurricane Jeanne in 2004, flooding at Good Samaritan reached several inches above some door thresholds at the community and that the campus's waste-water treatment facility failed, which contaminated the floodwater. (*Id.* 66:13–69:10, 135:6–16). Mr. Halquist opines that Good Samaritan's subsequent mitigation efforts, including augmenting a culvert and elevating waste-water treatment facility components, were insufficient. (Doc. 46-2 at 71:4–12).

During Hurricane Irma, Mr. Halquist led response efforts in Osceola County and observed what he then considered the worst flooding of his career. (Doc. 46-2 at 149:9–15). Floodwater, again contaminated by sewage, inundated several buildings at Good Samaritan. (Doc. 46-1 at 16; Doc. 46-2 at 100:3–5, 102:7–10). Mr. Halquist opines that after Irma, Good Samaritan should have decommissioned the waste-water treatment facility and invested in sandbags

6

and on-site sheltering, but Good Samaritan instead rebuilt many Irma-damaged units without implementing his suggested remediation protocols. (Doc. 46-1 at 7; Doc. 46-2 at 113:20–114:17, 143:4–18). He states that apart from minor improvements to the waste-water treatment facility and dredging at Shingle Creek, he is unaware of any significant mitigation efforts at Good Samaritan during his tenure at the County Office. (Doc. 46-1 at 28).

In September 2022, Hurricane Ian caused unprecedented flooding at Good Samaritan, surpassing the severity of Irma and reaching approximately 39.6 inches above the floor elevation in some units. (Doc. 46-2 at 147:2–7, 150:10–12). Mr. Halquist led emergency-response efforts for the County Office. He observed standing floodwater at Good Samaritan for weeks after the storm and notes that one drowning fatality occurred at the Good Samaritan campus. (*Id.* at 147:25–148:9, 167:5–25; Doc. 46-1 at 22). Mr. Halquist ordered the standing floodwater at Good Samaritan to be tested for pathogens, which confirmed the presence of harmful bacteria. (*Id.* at 147:10–24). He opines that while Ian was a more severe event in terms of water depth, its overall impact was only slightly greater than Irma's. (Doc. 46-1 at 22).

In his report, Mr. Halquist prepared a site-specific flood-risk assessment for Good Samaritan predicated on "personal knowledge, sourced technical data, historical reference, maps, tables, graphical representation, and photographs." (Doc. 46-1 at 14). He explains that the majority of the Good Samaritan campus

lies within the FEMA Special Flood Hazard Area—specifically, in the 1% (100-year) and .2% (500-year) annual chance flood zones. (*Id.*). He opines that the campus possesses an "amphitheater-like" topography that enhances its risk profile by funneling runoff from the higher southern part of the campus toward significantly lower-lying northern and western segments. (Doc. 46-1 at 16, 22). He supports this description through an analysis of Shingle Creek's gauge height system, which he interpreted using NAVD88—a vertical control datum used to measure land elevations. (*Id.* at 22). He notes that the terrain descends from sixty-seven feet NAVD88 at the entrance to as low as fifty-nine feet NAVD88 in the northern segment. (*Id.*). He states that although the Base Flood Elevation—the level to which floodwater is anticipated to rise during a 100-year storm—is sixty-three feet for most of the campus, many structures have finished floor elevations of only sixty-one feet. (Doc. 46-1 at 26). Mr. Halquist opines that these finished floor elevations fall roughly three feet below the Florida Building Code's minimum standard, which requires a safety buffer of one foot above the Base Flood Elevation. (*Id.*).

Mr. Halquist's report highlights that Good Samaritan is located in the Shingle Creek basin, a "hydrological catchment area" where precipitation and surface water converge. (Doc. 46-1 at 18). Because the basin is subject to "unregulated, unpermitted, or unknown discharges," Shingle Creek can reach the flood threshold independent of localized precipitation at Good Samaritan.

(*Id.*). This risk is exacerbated by soil saturation, urban development, and runoff from the West Branch Shingle Creek. (*Id.* at 24). Mr. Halquist notes that many Good Samaritan building units were constructed in the 1970s and were not required to meet modern flood-elevation standards at the time they were built. (Doc. 46-1 at 20).

Finally, Mr. Halquist includes the following "flood risk scoring criteria" chart in his report to assess the likelihood of the at-issue flooding:

**Flood Risk Scoring Criteria**

| Risk Assessment | | | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|
| Likelihood of Occurrence | | 4 | | | | |
| Capacity to cause damage | 5 | | | | | |
| Site Impact | 5 | | | | | |
| Population Affected | 5 | | | | | |
| Potential for Casualties | | | | 2 | | |
| Predictability of hazard | 5 | | | | | |
| Totals | 20 | 4 | | 2 | | |
| Grand Total 26/30 | | | | | | |

25-30 = Extreme
20-24 = High
14-19 = Moderate
18-13 = Low
4-9 = Slight
0-3 = None or Not Rated

| Risk Assessment | | | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|
| Likelihood of Occurrence | Most | Very | Moderate | Somewhat | Slight | None |
| Capacity to Cause Damage | Greatest | High | Moderate | Low | Minimal | None |
| Site Impact | Greatest | Large | Moderate | Low | Small | None |
| Population Affected | Greatest | High | Moderate | Low | Minimal | None |
| Potential for Casualties | Significant | Very High | High | Moderate | Low | None |
| Predictability of Hazard | Greatest | High | Moderate | Low | Minimal | None |

| Probability Scale | |
|---|---|
| The following table translates the common verbiage to a reasonable quantitative value applied to the hazard. | |
| 0 or None | No known occurrences of record. |
| 1 or Slight | Probability is one in 50 – 100 years. |
| 2 or Somewhat | Probability is one in 20 – 50 years. |
| 3 or Moderate | Probability is one in 11 – 20 years. |
| | Probability is one in 6 – 10 years. |
| | Probability is one in 1 – 5 years. |

(Doc. 46-1 at 27). To prepare this chart, he adapted six of the fourteen factors used in the Osceola County 2020 HIRA. (Doc. 46-2 at 177:9–18). Mr. Halquist acknowledged that he had never previously conducted a flood-risk assessment

9

in this manner, and he was unaware of any other practitioners or authoritative sources that recommend this application of the HIRA factors. (*Id.* at 170:10–178:2–5).

      2.    *Defendants'* Daubert *Challenges to Mr. Halquist*

      a.    **Qualifications**

Defendants argue Mr. Halquist is not qualified because his report states that he evaluated the "hydrological, topographic, and regulatory factors" pertaining to Good Samaritan, but he lacks any degree or specialization in those areas. (Doc. 46 at 13 (citing Doc. 46-1 at 26)). Mr. Halquist admittedly does not have specialized knowledge of hydrology, climatology, atmospheric sciences, or meteorology, and did not consult with someone who does. (*See* Doc. 46-2 at 20:23–21:3, 24:16–27:5, 44:4–46:8, 150:13–151:2).

"A district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548 (11th Cir. 1998)). "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Houston v. 7-Eleven, Inc.*, No. 8:13-cv-1845-T, 2014 WL 5856891, at *1 (M.D. Fla. Nov. 3, 2014) (citing *Frazier*, 387 F.3d at 1260–61). "The qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is minimally

10

qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Id.* (alteration in original) (quoting *Vision I Homeowner's Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009)). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

Mr. Halquist is a Certified Floodplain Manager and possesses extensive experience modeling flood risk in Osceola County. The subject matter of his report—the relative risk of flooding at Good Samaritan—is sufficiently within his expertise. Defendants insist that Mr. Halquist has no technical scientific expertise in hydrology and associated fields and thus has no basis to opine as to the likelihood of flooding at Good Samaritan, but that objection does not call into question his qualification to assess flood risk. It is plain from his report that he is not offering a specialized opinion in those fields; instead, his report is firmly grounded in the data sets that he has been shown to be familiar with and his experience in emergency management. Accordingly, Defendants' argument must be rejected. *Cf. Maiz*, 253 F.3d at 665 (finding that a damages expert in a real estate case was qualified to testify as to economic losses despite a lack of real estate development experience).

11

### b.    Sufficient Facts or Data

Defendants also argue that Mr. Halquist's analysis is not sufficiently granular in that he failed to analyze flood risk caused by a rainfall event as enormous as Hurricane Ian, instead analyzing only a generalized flood risk. But the significance of the quantity of the rainfall brought on by Ian is disputed, and Mr. Halquist was not obligated to assume Defendants' interpretation of the evidence. *See Perez v. Country Mut. Ins. Co.*, No. 5:14-cv-379-Oc-34PRL, 2016 WL 3232944, at *2 (M.D. Fla. May 4, 2016), *report and recommendation adopted*, 2016 WL 3219622 (M.D. Fla. June 10, 2016). Mr. Halquist's "failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring)).

Next, Defendants seek to exclude Mr. Halquist because his report erroneously cited the NAVD88 vertical datum when the levels from the relevant gauges were actually recorded in a different vertical control datum, NGVD29. Mr. Halquist acknowledged the mistake at his deposition but insists that his analysis of the flooding effects at different gauge heights still holds under NGVD29. (*See* Doc. 46-1 at 21–22; Doc. 46-2 at 155:22–161:10). Mr. Halquist's mistake does not require his exclusion under *Daubert*. It is "error to conflate admissibility with credibility," and "errors in an expert's application of a reliable

12

method generally implicate credibility rather than reliability." *Furmanite Am.*, 506 F. Supp. 2d at 1130 (citing *Quiet Tech. DC-8*, 326 F.3d at 1345-46, for the proposition that an expert's use of incorrect numbers in an otherwise reliable formula is not necessarily grounds for exclusion under *Daubert*). Defendants will have the opportunity to call Mr. Halquist's credibility into question on cross-examination.

### c.    Reliable Principles and Methods

Defendants seek to exclude the assessment scoring table in Mr. Halquist's report (Doc. 46-1 at 27) because it is "untested, unpublished, and not generally accepted" in his field. (Doc. 46 at 9). Mr. Halquist created the scoring table using six of the fourteen factors analyzed in the 2020 Osceola County HIRA for county-wide risks. (*Id.* at 9–10). For his part, Mr. Halquist admitted that he has never prepared a flood-risk scoring table in this manner before and he is not aware of any other source that has applied his chosen methodology. (Doc. 46-2 at 170:13–20, 171:5–9, 174, 176–77, 178:2–5). Defendants further charge that Mr. Halquist omitted relevant criteria from the HIRA report and that he assigns arbitrary scores to the factors he selected. (*See* Doc. 46 at 10–11).

"In ascertaining the reliability of a particular scientific expert opinion, [courts] consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular

13

scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8*, 326 F.3d at 1341 (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). Innovation in an expert report is not, in itself, a basis for exclusion. *See Daubert*, 509 U.S. at 593 (affirming the potential admissibility of "well-grounded but innovative theories"). But an untested, unproven, and arbitrary methodology will not withstand the *Daubert* inquiry.

Plaintiffs have not shown that Mr. Halquist's selection of six of the fourteen factors from a holistic assessment designed to assess general risk on a county-wide basis and application of those factors to a specific risk to a specific property is a generally accepted method of appraising risk. This is an instance where an otherwise valid scientific methodology has been misappropriated and contrived to reach a particular result in the guise of an expert opinion. *See Rink*, 400 F.3d at 1293 n.7. The factors and scores Mr. Halquist selected amount to "personal intuition offered up as professional expertise—untestable, unverifiable, and precisely the sort of expert say-so that *Daubert* excludes." *Lorente-Garcia v. Giraldo-Navarro*, No. 24-23066-CIV, 2025 WL 2271614, at *7 (S.D. Fla. July 9, 2025) (citing *Frazier*, 387 F.3d at 1262–63). Accordingly, the scoring table must be excluded.

14

### d.    Unfair Prejudice

Defendants also claim that allowing Mr. Halquist to testify that Good Samaritan faced "extreme" flood risk would be unfairly prejudicial because his opinion improperly conflates an "extreme" risk of even a minor flood with the risk of the unprecedented flooding that occurred in this case. The Court interprets this as an argument pursuant to Rule 403 and disagrees.

"The court's gatekeeping role 'is not intended to supplant the adversary system or the role of the jury.'" *Diamond Resorts U.S. Collection Dev., LLC v. Newton Grp. Transfers, LLC*, No. 9:18-CV-80311, 2022 WL 1642865, at *5 (S.D. Fla. Mar. 31, 2022) (quoting *Allison*, 184 F.3d at 1312). "Only the jury may determine 'where the truth in any case lies' and the court 'may not usurp this function.'" *Id.* (quoting *Frazier*, 387 F.3d at 1272). Cross-examination will provide the jury with sufficient tools to assess the veracity of Mr. Halquist's opinions.

Defendants also seek to exclude Mr. Halquist's "backwater" and "rebuttal" opinions that were offered for the first time at Mr. Halquist's deposition. (Doc. 46 at 17–21; Doc. 46-2 at 156:25–161:10, 202:01-203:6). In response, Plaintiffs insist that Mr. Halquist is not offering these opinions and was merely responding to questioning. (Doc. 54 at 14–15). Because Plaintiffs state that Mr. Halquist will not be offering an opinion on these matters, they will be excluded.

15

*3.    Conclusion*

Mr. Halquist is qualified to opine as to the flood risk at Good Samaritan. His opinions rest on sufficient facts and data and his testimony will not cause Defendants undue prejudice. However, the scoring chart, the acknowledged improper legal opinions, and his "backwater" and "rebuttal" opinions must be excluded under *Daubert* and Federal Rule of Evidence 702.

**B.    Megan D. Walker**

Defendants retained forensic meteorologist Megan D. Walker to investigate rainfall patterns during Hurricanes Irma and Ian. (Doc. 51-1). In her report, she explains that although both storms caused "historically heavy rainfall" in the Orlando area, "Hurricane Ian was a significantly more extreme and rare rainfall event than Hurricane Irma." (*Id.* at 29). Plaintiffs move to exclude Ms. Walker pursuant to Federal Rules of Evidence 702 and 403. (Doc. 51).

*1.    Summary of Ms. Walker's Opinions*

Ms. Walker's report attempts to quantify the rainfall at Good Samaritan and across the Shingle Creek drainage basin during Hurricanes Irma and Ian and place those figures within a broader "climatological context." (Doc. 51-1 at 1). Ms. Walker explains that no single database can provide reliable rainfall measurement for Good Samaritan during these storms; thus, she "analyzed and synthesized" several complementary databases from various official sources to

16

reach her conclusions. (*Id.* at 8). The databases she considered were sourced from the National Oceanic and Atmospheric Administration (NOAA), the National Weather Service (NWS), and the National Hurricane Center (NHC). (*Id.* at 4–18).

First, Ms. Walker analyzed "in-situ" rainfall data derived from rain gauges. (Doc. 51-1 at 8–9). She sourced this rain-gauge data from post-tropical cyclone reports issued by the NWS and the Melbourne, Florida Weather Forecast Office, tropical cyclone reports from the NHC, and meteorological aerodrome reports from automated surface observing systems in Orlando. (*Id.*). Although she opines that rain gauges provide the most accurate measurement of local rainfall quantity, she explains that relying on rain gauges alone is problematic because they are "sparse[ly]" distributed, with distances between reporting stations often exceeding several miles. (*Id.* at 12).

To account for the spatial limitations of the rain gauges, Ms. Walker compared the gauge data to radar-indicated precipitation data. (*Id.*). Unlike the in-situ rain gauge, radar offers "nearly continuous spatial and temporal coverage." (*Id.*). However, Ms. Walker explains that radar does not measure precipitation directly. Instead, it estimates precipitation through empirical relationships between the radar targets and the signal transmitted back to the radar dish. (*Id.*). She states that radar data is used by the NWS to issue flood

17

advisories, but its accuracy is known to diminish during intense weather events. (*Id.*).

To reconcile the discrepancies between in-situ rain gauge data and radar-estimated precipitation, Ms. Walker employed a "mean field bias correction." (*Id.* at 13). She claims this is an "established" technique that compares rainfall totals from the rain gauge stations nearest Good Samaritan and the broader Shingle Creek drainage basin with radar estimates for those same locations. (*Id.*). The average difference between the radar estimates and the rain gauge measurement at a given location constitutes the "bias-correction factor." (*Id.*). Ms. Walker explains that by calculating the average degree to which radar misestimated rainfall at known gauge locations, she can derive a factor to adjust radar data across a wide spatial territory. (*Id.*). Applying the bias-correction factor to radar data allows her to extrapolate more accurate rainfall totals for areas without rain gauges, including Good Samaritan. (*Id.*).

Ms. Walker utilized data from thirteen rain-gauge stations to calculate the bias-correction factor for Hurricane Ian. Of these, eleven were located within the Shingle Creek drainage basin, while the remaining two were situated close to Good Samaritan but outside the basin. (*Id.* at 13–14). For Irma, the gauge data was thinner, as the available stations were diffusely spread across the Shingle Creek basin, but Ms. Walker still relied on the closest ten stations to Good Samaritan. (*Id.* at 13, 15).

18

Ms. Walker also relied on the Quantitative Precipitation Estimate (QPE), a "multi-sensor product" that integrates data from various radars and rain gauges to generate 24-hour rainfall totals. (*Id.* at 16). After evaluating QPE data for Hurricane Ian against her bias-corrected data, Ms. Walker determined that the QPE accurately captured the spatial distribution of rainfall within the Shingle Creek drainage basin. However, she found that the QPE "substantially underestimated" rainfall compared to the available gauge data for Hurricane Irma. For Irma, she instead examined the Digital Storm Total Precipitation Accumulation (DTA) radar product, which she states more closely resembled the spatial pattern of rainfall indicated by the gauges. (*Id.* at 16–17). She then applied the bias-correction procedure to the DTA rather than the QPE for the Irma analysis and concluded that the bias-corrected DTA data provide an accurate estimation of Hurricane Irma's rainfall dynamics. (*Id.* at 17).

To determine the recurrence intervals for each storm, Ms. Walker utilized NOAA's Atlas 14 system. (Doc. 51-1 at 10). She opines that Atlas 14 is "the recognized authority on rainfall recurrence intervals within the weather and climate community." (*Id.*). The rainfall data integrated into Atlas 14 includes rain-gauge measurements from tropical cyclone reports, radar-estimated rainfall, and the QPE. Her report contains a rainfall-recurrence-interval table that illustrates the recurrence rate of different rainfall events based on the duration and quantity of the rainfall. (*Id.* at 11).

19

She estimates that between 8.9–9.4 inches of rain fell at Good Samaritan during Hurricane Irma and totaled 2.976 billion cubic feet across the Shingle Creek drainage basin. (*Id.* at 1, 19, 29). She concludes that the return period for Irma's total precipitation at Good Samaritan was likely 25–50 years. (*Id.* at 1, 19, 21, 29). Ms. Walker estimates that Hurricane Ian dumped 16.9–17.3 inches of rain at Good Samaritan and that 4.059 billion cubic feet of rain fell across the Shingle Creek drainage basin. She calculates that the rainfall volume produced by Ian likely constitutes a 1 in 200-year storm event. (*Id.* at 1, 22–23, 29).

2.    *Plaintiffs'* Daubert *Challenges to Ms. Walker*

Plaintiffs argue that Ms. Walker's opinions would not be helpful to the trier of fact, that her report lacks sufficient facts and data, and that it is unfairly prejudicial under Rule 403.

### a.    Helpfulness to the Trier of Fact

Plaintiffs claim Ms. Walker's testimony would not be helpful to the trier of fact because: (1) her opinions are not relevant to the issue of foreseeability of flooding; (2) she ignores other factors relevant to the foreseeability of flooding; and (3) rainfall totals are a matter of public record, rendering her testimony redundant. (Doc. 51 at 4–5).

"Expert testimony helps where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute." *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184, 1190 (M.D.

Fla. 2022) (citing *Kumho Tire*, 526 U.S. at 148–49). "Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic considering the evidence and testimony presented at trial." *Id.* (citing *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001)). "Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403." *Id.* (citing *Daubert*, 509 U.S. at 591).

Defendants contend that the rainfall totals have a high degree of explanatory power over the ultimate issues in this case. Thus, expert testimony regarding the "climatological context" of rainfall data at Good Samaritan is potentially helpful to the trier of fact in evaluating Defendants' theory of the case. Defendants are free to argue the inference that the high rainfall totals and rare rainfall recurrence rates described in Ms. Walker's report render the at-issue flooding unforeseeable. That Plaintiffs interpret the significance of the evidence differently is not a valid basis for exclusion under *Daubert*. Plaintiffs can attempt to demonstrate during cross-examination that it was erroneous for Ms. Walker not to consider factors other than rainfall. *See Quiet Tech. DC-8*, 326 F.3d at 1346.

Finally, Plaintiffs' objection that the Court could simply judicially notice publicly recorded rainfall calculations is unpersuasive. Ms. Walker's report

21

states that the publicly available rainfall data is inaccurate, and she provides a detailed methodology in which she purports to combine complementary data sets and implements a mean-field bias-correction protocol to improve accuracy. The calculation of rainfall totals and rainfall recurrence intervals using several discrete data sets for each storm is not an exercise in common sense or simple logic that jurors should be expected to perform on their own. Plaintiffs will have the opportunity to cross-examine Ms. Walker about alternative sources documenting rainfall totals for these storms if Plaintiffs so choose.

### b.      Sufficient Facts or Data

Next, Plaintiffs charge that Ms. Walker's report is not based on sufficient facts or data. "A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz*, 253 F.3d at 666 (quoting *Allison*, 184 F.3d at 1311). Rather, "shaky but admissible evidence" should be attacked via "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. However, district courts may exclude an expert when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Ms. Walker relies on data collected by NOAA, the NWS, and the NHC. Her selection of databases is grounded in academic literature and appears to be the kind of data that an expert meteorologist would reasonably rely on. (Doc.

51-1 at 4–18); *see SFR Servs., LLC v. Am. Coastal Ins. Co.*, No. 2:22-cv-505, 2025 WL 436714, at *4 (M.D. Fla. Feb. 7, 2025) (citing "historic NOAA weather data" as sufficient data under *Daubert*). In her report, Ms. Walker adequately explained the data sets she used and notified Plaintiffs of all materials that she considered in formulating her opinions. (*See generally* Doc. 51-1).

Plaintiffs argue that Ms. Walker improperly relied on "limited rain gauge data, selective radar stations, a case-specific mean-field bias [] correction that she created for this matter, and unexplained presentation of extraordinary rarity estimates." (Doc. 51 at 7). Plaintiffs point out that no rain-gauge stations were located in close proximity to Good Samaritan at the time of Hurricane Irma, and they characterize the available rain-gauge stations during Ian as only "slightly" better. (*Id.* at 8). Plaintiffs accuse Ms. Walker of attempting to remedy these "flaws" by considering radar and other data, which Plaintiffs criticize as "fragile" data, the inclusion of which only compounds the potential errors. (Doc. 51 at 9).

Plaintiffs' critiques might have a certain degree of statistical or epistemic merit, but they do not provide a basis for exclusion under *Daubert*. Ms. Walker reviewed meteorological data from multiple sources, compared Good Samaritan's location to the source of the data, generated a bias-correction procedure based on the data she reviewed, and formed an opinion about the extent of the rainfall that occurred at Good Samaritan. Other courts have not

found fault with the sufficiency of data in similar circumstances and have often approved of meteorology experts who survey and synthesize discrete weather databases. *See, e.g., MCFS & BB, Inc. v. Hartford Ins. Co. of the Se.*, No. 3:21-cv-254, 2022 WL 2818107, at *4 (M.D. Fla. July 19, 2022); *Coward v. Forestar Realty, Inc.*, 2018 WL 1980368, at *19 (N.D. Ga. Feb. 20, 2018); *Law v. Avco Corp.*, No. 1:24CV3-MW/MAF, 2025 WL 3525579, at *1 (N.D. Fla. Oct. 7, 2025). This Court will do likewise.

This is not a case where an expert cited rain-gauge data from one part of town and attempted to assert that it was informative about rainfall totals across the city. *See T & D Kohlleppel Farms, Inc. v. Bexar, Medina, Atascosa Cntys. Water Control & Improvement Dist. No. One*, No. SA-10-CV-0368 FB NN, 2011 WL 5282700, at *3 (W.D. Tex. Nov. 2, 2011). Rather, in this case an expert, appearing to employ meteorological best-practices, synthesized admittedly incomplete rain-gauge data with radar and other data to enhance accuracy. Ms. Walker detailed the data she relied on, why she relied on it, and proffered that it was the type of data that other meteorologists would consider. Thus, Plaintiffs' objections about the inadequacies of the data go to weight rather than admissibility. *See Nat'l Ass'n for Advancement of Colored People v. State of Fla. Dep't of Corr.*, No. 5:00-cv-100-Oc-10GRJ, 2002 WL 34419684, at *2 (M.D. Fla. July 22, 2002) (explaining that "[t]here is a significant difference between challenging an expert's opinion based on falsely manufactured data or data not

24

ordinarily relied upon by experts, and challenging the expert's opinion because of a disagreement with the expert's characterization of the core information upon which the expert relies"). Plaintiffs will be free to cross-examine Ms. Walker about the validity of the data she relied on.

### c.    Unfair Prejudice

Plaintiffs argue the jury will be unfairly misled by Ms. Walker's testimony because under the guise of rainfall analysis, her report implies that the at-issue flood was unforeseeable. But the Court is not in a position to determine whether the historic nature of the rainfall from Ian was necessary to cause Plaintiffs' damages or if Plaintiffs would have been similarly damaged during a more typical storm. Accordingly, expert testimony is permissible on the subject of rainfall analysis. The Court is satisfied that any risk of unfair prejudice brought on by Ms. Walker's testimony can be cured during cross-examination.

### 3.    Conclusion

Ms. Walker's opinions are helpful to the trier of fact, rest on sufficient facts and data, and otherwise pass muster under *Daubert* and the Federal Rules of Evidence. They are therefore admissible at trial.

### C.    David W. Hamstra

Defendants retained David W. Hamstra, a stormwater engineer, to "investigate allegations that adequate measures were not taken to mitigate the damage sustained during Hurricane Irma." (Doc. 51-2 at 1). Mr. Hamstra

assessed the circumstances surrounding the at-issue flood, detailed Good Samaritan's attempts at obtaining funding to implement mitigation measures following Irma. Having done so, he opines that Good Samaritan, through no fault of its own, could not have secured mitigation that would have prevented the damage in this case. Plaintiffs seek to exclude his testimony under Rule 702, arguing that he impermissibly asserts legal conclusions and that his opinions are not the product of reliable principles and methods and would not be helpful to the trier of fact.

### 1.    Summary of Mr. Hamstra's Opinions

Mr. Hamstra's engagement with Good Samaritan began in 2017 through his work with Pegasus Engineering, a firm Good Samaritan retained following Hurricane Irma to provide "grant consulting and technical engineering support services." (Doc. 51-2 at 22). Pegasus's primary objective was to "assist Good Samaritan in developing a conceptual flood plan and to pursue federal disaster funding." (Id.). Pegasus engaged FEMA on behalf of Good Samaritan to discuss potential mitigation funding under both the Public Assistance and the Hazard Mitigation Grant programs, in coordination with the Osceola County Local Mitigation Strategy Working Group and the Florida Division of Emergency Management (FDEM). (Id. at 22–23). Mr. Hamstra explains that Good Samaritan ultimately withdrew from FEMA's Public Assistance Program to focus instead on the Hazard Mitigation Grant Program (HMGP). (Id. at 24).

26

Mr. Hamstra recounts that in 2018, Pegasus "submitted a comprehensive HMGP application package to FDEM," which included a proposal to elevate eighty-seven existing structures at Good Samaritan to one foot above the 500-year flood stage, an endeavor that would cost $50 million. (Doc. 51-2 at 25). Good Samaritan also attempted to secure supplemental funding though the State of Florida's fiscal year 2019–2020 Appropriations Process as well as from the Florida Department of Economic Opportunity. (*Id.* at 25–26).

Mr. Hamstra states that in 2019, FDEM responded to Good Samaritan's elevation proposal by recommending that Good Samaritan prioritize decommissioning the waste-water treatment facility instead, which, in turn, would bolster Good Samaritan's claim for a future elevation project. (*Id.* at 25). Therefore, Pegasus began work on a proposal that would abandon the existing waste-water treatment facility and connect the community's wastewater flow to the Toho Water Authority system. (*Id.* at 25, 27). Mr. Hamstra states that Pegasus submitted an HMGP application for the waste-water treatment facility decommission project. (*Id.* at 27). In 2020, Good Samaritan received the Phase I grant agreement for the waste-water treatment facility decommission project and also sought additional funds by submitting another state appropriations application to the Florida Legislature for fiscal year 2020–2021. (*Id.* at 27–28, 31).

27

Mr. Hamstra notes that several benchmarks must be met before a project can advance from Phase I to construction. These benchmarks include the selection of a design consultant to prepare a detailed scope of work and fee estimate, the acquisition of required permits, and the preparation of bid documents, which together take several months to complete. (*Id.* at 31). Only then can Phase II begin, at which point the project can be advertised for bid and construction can commence. (*Id.*). Mr. Hamstra opines that the waste-water treatment facility decommission project was on pace for construction completion by 2023 at the earliest. (*Id.* at 32). In sum, Mr. Hamstra opines that a significant and unavoidable time horizon existed between the time Hurricane Irma struck Good Samaritan and the time at which mitigation could be completed.

Mr. Hamstra reports that in addition to the HMGP application to decommission the waste-water treatment facility, Good Samaritan submitted a Hurricane Loss Mitigation Program grant application to the FDEM aimed at enhancing the community center's ability to "withstand high wind-events" and explored a dredging project along Shingle Creek. (*Id.* at 28–29). Good Samaritan also proposed a venture with Landon Properties, a neighboring entity, to install flood control measures around Shingle Creek, but it did not come to fruition because the project was opposed by affected private landowners. (*Id.* at 30).

In his capacity as a stormwater engineer, Mr. Hamstra analyzed the flood risk facing the property at the time of Hurricane Ian. He assessed the

28

topography of the property, reviewed and accepted Ms. Walker's rainfall analysis, and performed his own calculations of the flood depths with rain-gauge heights, which he computed using the NGVD29 vertical datum. He opines that Hurricanes Irma and Ian were the only times that "structural flooding" occurred at Good Samaritan in the previous forty-five years. (*Id.* at 13). He states that given the enormity of the rainfall caused by Hurricane Ian, "the resulting flood stages at [Good Samaritan] could not have been reasonably anticipated or prevented" and that the impact would have been severe even if the waste-water treatment facility decommission project had already been completed. (*Id.* at 34).

2. *Plaintiffs'* Daubert *Challenges to Mr. Hamstra*

**a. Reliable Principles and Methods**

Plaintiffs assert that Mr. Hamstra's lengthy narration of Good Samaritan's unsuccessful efforts to procure mitigation funding is simply "a justification of Defendants' policy choices rather than an independent expert assessment grounded in engineering methodology." (Doc. 51 at 18). Plaintiffs also take exception to his claim that Hurricane Ian was a "200- to 500-year event," asserting that this opinion is speculative and untethered to "any accepted engineering standard or methodology." (*Id.* at 19).

To protect the jury from confusion by unreliable experts, courts must "evaluate the reliability of the testimony before allowing its admission at trial." *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023) (quoting *Frazier*,

29

387 F.3d at 1262). Although expert reports often require rigorous scientific or statistical analysis, "*Daubert* also allows for admitting experts whose methods are less formal, such as when an expert testifies primarily based on experience." *Kumho Tire*, 526 U.S. at 151. The proponent of the testimony in such a case must "explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *Frazier*, 387 F.3d at 1265.

Through his education, training, and experience, Mr. Hamstra has obtained expertise in the specialized process of mitigation grant funding. Moreover, his report details how he is aware through his role with Pegasus of the different mitigation options that were available to Good Samaritan, the mitigation plans that Good Samaritan considered, and the grant funding sources that Good Samaritan sought out. His experience provides an adequate basis for his opinions, and that experience appears to be reliably applied to the facts of this case. *See Esformes*, 60 F.4th at 637 (rejecting objection regarding methodology concerning expert testimony on how skilled nursing facilities operate, the types of patients that are suitable, and how Medicare and Medicaid treat stays in skilled nursing facilities).

Plaintiffs also seek to exclude Mr. Hamstra's opinion that Hurricane Ian was a 200- to 500-year storm event on the grounds that his opinion is unsupported by reliable engineering principles. (Doc. 51 at 19). Under *Daubert*,

an "expert's testimony may be formulated by the use of the facts, data and conclusions of other experts" so long as the expert does not "merely regurgitate another expert's opinion." *Davis on Behalf of J.D.D. v. Carroll*, 329 F.R.D. 435, 442 (M.D. Fla. 2018) (citing *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357 (S.D. Fla. 2009)). Here, Mr. Hamstra properly relies on Ms. Walker's report and supplies his own analysis, including his own study of the property's topography, rain-gauge flood elevation readings, and historical rainfall data—all of which are within his competency to evaluate as a stormwater engineer.

### b.    Helpfulness to the Trier of Fact

Plaintiffs also argue that Mr. Hamstra's report would not be helpful to the trier of fact because it merely functions as a self-interested "advocacy piece" for the work that he performed for Good Samaritan in his capacity with Pegasus before this case began. (Doc. 51 at 16). However, the existence of "[b]ias in an expert witness's testimony is usually a credibility issue for the jury." *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1332 (11th Cir. 2014) (citing *United States v. Abonce–Barrera*, 257 F.3d 959, 965 (9th Cir. 2001), and *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000)). On cross-examination, Plaintiffs will be free to explore Mr. Hamstra's business relationship with Good Samaritan and how it might have skewed his analysis

### c.    Impermissible Legal Conclusions

Plaintiffs contend that Mr. Hamstra offers impermissible legal

conclusions when he opines that "the allegations made by Plaintiffs and their legal counsel are unfounded and without merit"; that Good Samaritan "acted responsibly"; "took reasonable steps"; "appropriately pursued mitigation"; and "fulfilled its responsibilities." (Doc. 51-2 at 34). Plaintiffs claim these are not legitimate engineering opinions but rather are instructions to the jury on how to resolve the ultimate issues in the case. (Doc. 51 at 19–20).

"While expert witnesses may offer opinions on an 'ultimate issue' in a case, they may not offer 'legal conclusions.'" *United States v. F.E.B. Corp.*, 52 F.4th 916, 932 (11th Cir. 2022) (quoting *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018). "[C]ourts have excluded expert testimony amounting to conclusions whether conduct was reasonable or whether harm was foreseeable, when such testimony embraces the legal definition of the terms." *Feldman v. Target Corp.*, No. 3:19-cv-419, 2021 WL 1172794, at *2 (M.D. Fla. Mar. 29, 2021) (citing *In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2018 WL 4212409, at *3 (S.D.W. Va. Sept. 4, 2018), and *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-CIV, 2018 WL 3584702, at *5 (S.D. Fla. July 25, 2018)).

In opining about the nature of the mitigation process and the possible grant sources Good Samaritan explored, Mr. Hamstra's report embraces the ultimate issue of Good Samaritan's alleged negligence in this case while remaining within the bounds of permissible expert testimony. However, the

32

Court agrees with Plaintiffs that Mr. Hamstra's report crosses the line when he asserts that Plaintiffs' claims are meritless and that Good Samaritan acted reasonably and responsibly under the circumstances. Although, as Defendants claim, one can use the terms "reasonable" and "responsible" in a colloquial sense, the terms as used in Mr. Hamstra's report appear tinged with legal meaning and must be excluded. Whether Good Samaritan "acted responsibly," "took reasonable steps," "appropriately pursued mitigation," or "fulfilled its responsibilities" are legal questions for the trier of fact. *See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). Based on Mr. Hamstra's testimony about the nature of the mitigation process and Good Samaritan's conduct in attempting to secure grants, Defendants may argue the inference to the jury that Good Samaritan acted reasonably under the circumstances and fulfilled its responsibilities. But Mr. Hamstra will not be permitted to offer a legal opinion.

### 3.   *Conclusion*

Mr. Hamstra's opinions on the legal implications of Good Samaritan's conduct described above will be excluded, but the remainder of his report is adequate the Federal Rules of Evidence and is admissible at trial.

## IV.  CONCLUSION

As set forth above, it is **ORDERED** that Defendants' *Daubert* motion (Doc. 46) and Plaintiffs' *Daubert* motion (Doc. 51) are both **GRANTED** in part. The Court excludes the following expert testimony:

1.   Mr. Halquist's flood risk scoring chart (Doc. 46-1 at 27);

2.   Mr. Halquist's legal conclusions as to the foreseeability of the flood (*id.* at 29–30);

3.   Mr. Halquist's "backwater" and "rebuttal" opinions (Doc. 46-2 at 156:25–161:10, 202:01-203:6);

4.   Mr. Hamstra's legal conclusions that Plaintiffs claims are "unfounded and without merit"; that Good Samaritan "acted responsibly"; "took reasonable steps"; "appropriately pursued mitigation"; and that it "fulfilled its responsibilities" (Doc. 51-2 at 34).

In all other respects, the motions are **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on May 7, 2026.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

34